UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STEVE G. DINSMORE,

    Petitioner,

    v.

GREG LEWIS,

    Respondent.
_____/

No. C-11-3296 EMC (pr)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY**

    Steve Gary Dinsmore filed this *pro se* action seeking a writ of habeas corpus under 28 U.S.C. § 2254, challenging his state conviction. The matter is now before the court for consideration of the merits of the habeas petition. For the reasons discussed below, the petition will be denied.

### I. BACKGROUND

    A Humboldt County jury found Dinsmore guilty of assault on a peace officer with an automatic firearm use enhancement, resisting an executive officer, two counts of being a felon in possession of a firearm, and possession of methamphetamine. The jury also found true a prior strike allegation. Dinsmore was sentenced to thirty years, eight months in state prison, consisting of the upper term of 18 years (9 years, doubled because of the strike) for the assault on a peace officer charge, and 10 years for the gun use enhancement. Midterm sentences for counts three and five were stayed, and one-third of four year midterm sentences for counts four and six were ordered to run consecutively. On appeal, his conviction was affirmed by the California Court of Appeal and his petition for review was denied by the California Supreme Court.

    Thompson does not dispute the following facts, which are excerpted from the opinion of the California Court of Appeal:

Deputy Justin Braud of the Humboldt County Sheriff's Department testified that on November 6, 2005, he was driving a patrol car in Eureka shortly after midnight when he saw a green Camaro with expired registration tags. He pulled the car over and approached the driver, Richard Dorey. He recognized the passenger as defendant, whom he had known since childhood. He had heard from various people, including Sergeant Bryan Quenell who also knew defendant, that defendant always carried firearms and "Was into drugs and stuff.... It was just common knowledge, I guess." Braud discovered that there was an outstanding warrant for defendant. Quenell and Sergeant Michael Fridley arrived at the scene and Quenell stated that they should make contact with defendant. Braud approached the driver's side of the car and Fridley and Quenell went to the passenger side. Braud asked defendant if he had any weapons and defendant replied that he might have a knife.

Fridley testified that he "had been told that [defendant] was possibly carrying weapons on his person most any time that he was out." Quenell asked defendant to get out of the vehicle but he "just sat there and continued to look straight forward." Quenell then opened the car door and again asked defendant to step out. Defendant "pivoted in the seat, remained seated but stuck his feet outside the car as if he was going to stand up." Quenell then grabbed defendant and pulled him to is feet. Quenell ordered defendant to turn and face the car. Defendant "just stayed standing in the position that he was in. He didn't turn around." Fridley believed that defendant was preparing to run. When Quenell grabbed defendant by his jacket and turned him to face the car, defendant "did some kind of move where he ducked down and Sergeant Quenell still had a hold of his jacket." Defendant "was able to pull himself out of that jacket, he started to run." Fridley caught defendant and placed him in a headlock. Braud approached defendant from behind, grabbed him around the chest and forced him to the ground. Fridley saw a pistol tucked into the back of defendant's belt. He yelled "gun," then grabbed the weapon and threw it away from defendant. Braud was still struggling to hold defendant. Fridley yelled at defendant that he would use a taser if he did not comply. Defendant did not stop struggling and Fridley applied the taser to defendant's right shoulder. Defendant yelled, but continued to struggle. Fridley continued to order defendant to "Lie flat. Get on the ground." Fridley heard Quenell yell "gun" and "saw the biggest gun I've ever seen in my life" in defendant's right hand, pointed at Braud. Fridley struggled with defendant for control of the gun and placed his thumb in the trigger to prevent it from being fired. When Fridley was able to take the gun from defendant he threw it away from the struggle.

Sergeant Randy Garcia testified that shortly after midnight he received a radio broadcast from Sergeant Quenell calling for immediate assistance. When Garcia arrived at the scene he saw a green Camaro and Dorey "standing near one of the open doors of one of the patrol cars." Garcia drew his firearm and Dorey "stepped back from the vehicle, put his hands up and said, 'No, no, no. It's not me. I was trying to call for help.'" Garcia heard yelling and ran to the other side of the Camaro where he saw Quenell, Fridley and Braud standing over defendant, who was on his stomach on the ground. Garcia was told

2

that defendant had a handgun "and was trying to pull the trigger." Garcia leaned over defendant "towards the left side of his body and assist[ed] in trying to remove the handgun from his hand." Defendant was still trying to get control of the gun. Fridley had "the web of his hand... between the hammer of the firearm and the firing pin." Garcia was "afraid that someone was going to die." Defendant "was actively trying to get away, trying to fight." They "continued to struggle for a long time, five, six, seven minutes.... The defendant continued to resist. He was trying to pull the trigger of the firearm with his thumb. His thumb was in the trigger, in the trigger guard. He continued to try to pull the trigger the entire time I was there." The officers applied a taser, pepper spray, and struck defendant in the head in an attempt to disarm him but these techniques were ineffective. Garcia told Quenell to strike defendant with his baton and after he did so they were able to disarm defendant. Defendant "continued to actively resist" being handcuffed and continued to struggle after he was placed in handcuffs.

The driver, Richard Dorey, testified that defendant stumbled when he tried to get out of the car on the orders of the officers, and that the officers then "attacked him." "[T]hey spun him around and they were startin' to struggle right there. And they... just attacked him when he got out of the car, that's what happened." Dorey did not hear defendant threaten the officers at any point. He knew that defendant had a gun. He stated that he did not believe defendant assaulted the officers but conceded that "he was resisting arrest, more or less, yep, but not assaulting."

Jimmy Bowie lived across the street from where defendant was arrested and came home shortly after the police stopped the Camaro. He retrieved a digital audio recorder from his house and went outside to record the incident. He estimated that he was "15 to 30 yards away, not even very far. Just across the street, actually." [FN3] He saw defendant lying on his stomach on the ground and heard one of the officers yell, "Get back. Get back. I'm gonna shoot this fucker in the head." Bowie was "absolutely positive" that this statement was made by one officer to another officer. Bowie saw that the officer making this statement had a gun aimed at defendant. Bowie had an unobstructed view of the incident. He never saw defendant in possession of a gun or a knife, nor did he hear defendant make any threats.

    FN3. An evidence technician measured the distance as 47 feet.

Bowie did not know defendant at the time of the incident but later met him when they were both in custody in the county jail. Bowie overheard defendant talking to another person about the fact that someone had recorded the incident, so Bowie introduced himself. They did not become friends nor spend any additional time together beyond two weeks when they were both in custody and approximately a month when both were later again in custody. The day after the incident Bowie was visited by a sheriff who asked if he had witnessed the incident. Bowie gave the officer the recording he had made.

On the recording one heard a male voice saying, "I know what I gotta do. I'll shoot him if you don't move. Back up or he's dead. Back

3

down now or I'll fuckin' kill you. Swear to God." Braud listened to the recording and testified that the voice was not that of Quenell or Fridley, and that he was certain he recognized it as defendant's voice. Garcia testified that the statement was not made by any of the deputies.

...

Defendant did not testify, but his attorney argued that he did not make the statement heard on Bowie's recording. Defendant called as a witness Gregg Stutchman, an audio forensic analyst. Stutchman reviewed the digital recording of the arrest. He identified defendant's voice initially by remarks that could clearly be attributed to him, and then he met with defendant to "hear his voice and obtain an exemplar of his normal speech. And it was my hope to obtain an exemplar of him yelling some of the things that were on the recording." He was not able to prepare a spectrographic analysis of defendant's voice because "the protocol for spectrographic analysis is to obtain the exemplar in as close to the same manner as you can as the original was made on," and he did not have the ability to get an exemplar of defendant's voice outdoors, but only in a cinderblock room with "a great deal of reverberation." He performed a pitch analysis on the statement at issue and concluded based on that analysis that it was "extremely unlikely" that the phrase was uttered by defendant.

The prosecution called Hirotaka Nakasone, a forensic audio examiner for the FBI, as a rebuttal witness. He explained that pitch rises when a speaker is excited. Nakasone testified that established standards for voice analysis mandate that a voice examination be terminated if the subject is under the influence of drugs or alcohol. A test of defendant's blood draw after he was taken to the hospital that night revealed the presence of amphetamines, methamphetamine, and methadone. Nakasone listened to the recording made the night of the incident and the recording that Stutchman made of defendant while he was in jail. After examining Stutchman's analysis, Nakasone opined that "the main focus of this report seems to me that he did a lot of audio processing, filtering, making transcriptions, but I fail to see that he is delineating any explicit procedures and method he would be applying to do voice comparison." He stated that Stutchman's report lacked reference points that would make it scientifically meaningful. "If that information is here to explain or to describe how he did a voice comparison, doesn't make sense at all. It's simply measured pitch from one speaker and pitch in another and a pitch in another. All these produced in the very extreme conditions." Nakasone continued, "He just measured four pitches. One is a normal pitch coming from one individual. And if there are other people in dispute... there should be other measurements from other people, as well, but I don't see anything at all. And also... it just doesn't make sense to compare normal pitch against extreme pitch. It... doesn't have any scientific basis. In my 21 years of professional career, I have never run into this type of method to do voice identification." He also noted that speaker identification would be "very difficult" on the recording made of the incident because the speakers were so far away from the recording device and because the speakers were "quite excited, angry, shouting, probably under a very stressful, extreme stressful situation...."

4

> Nakasone did not believe it would be possible to identify the speakers from that recording. He did not believe that a person familiar with the people involved "may be able to do identification."
>
> The jury was unable to reach a verdict on the attempted murder charge, and the court declared a mistrial on that count. The jury found defendant guilty of the remaining counts and found the enhancement allegations to be true. The trial court later dismissed the attempted murder charge on the prosecution's motion. Defendant was sentenced to 30 years eight months' imprisonment and timely appealed.

Cal. Ct. App. Opinion ("Op."), pp. 2-7; Ex. C7.[1]

## II. JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged conviction occurred in Humboldt County, California, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## III. EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. *See* 28 U.S.C. § 2254(b), (c). The parties do not dispute that the state judicial remedies were exhausted for the claims in the petition.

## IV. STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review. A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

---

[1] Citations to "Ex." are to the record lodged with the court by the Attorney General.

5

established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

## V. DISCUSSION

As grounds for habeas relief, Dinsmore claims the following: (1) due process violation as a result of the trial court's denial of new trial motion; (2) ineffective assistance of counsel for failing to obtain a second voice analysis until after trial; (3) ineffective assistance of counsel for failing to object to the reading of the prior conviction allegations to the jury; and (4) ineffective assistance of counsel for failing to object and preserve sentencing error claims for appeal.

A. Due Process

The Court of Appeal summarized what occurred at trial with respect to the Dinsmore's motion for a new trial.

> After the jury returned its verdict, defendant moved for a new trial on the charges of attempted murder, assault on a peace officer, and resisting arrest, based on the ground of newly discovered evidence. [FN4] The trial court denied the motion with the following explanation: "First, I'm not persuaded it would be newly discovered evidence. Second, I do not find that a different result would be probable as to counts two and three if the additional evidence were

6

presented to a jury.  And, finally, I do believe that the defense could have offered the evidence at the earlier trial with reasonable diligence."  Defendant challenged the denial of the motion in this appeal.

> FN4.  It is not clear why defendant addressed his motion to the attempted murder count, since the jury did not reach a verdict on that count.  In all events, the court's order denying the motion appears to have been addressed only to the counts on which defendant had been convicted.  As indicated above, the attempted murder count was ultimately dismissed.

Section 1181 provides in relevant part:  "When a verdict has been rendered... against the defendant, the court may, upon his application, grant a new trial, in the following cases: [¶]...[¶] 8.  When new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial...."  "In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: "'1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits."'" (*People v. Delgado* (1993) 5 Cal.4th 312, 328.)  "'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.'"  (*People v. Williams* (1988) 45 Cal.3d 1268, 1318.)

The evidence upon which defendant based his new trial motion was the testimony of another voice analyst, Tom Owen, who obtained another exemplar of defendant's voice that was created "in the same manner as the words were recorded."  Owen applied various methods of analysis to the digital recording and the exemplar and concluded with a "reasonable degree of scientific certainty" that defendant did not make the disputed statement.  Defendant argues that Owen's testimony is "new" evidence because Stutchman was unable to obtain an exemplar of his voice outside of the jail and in opining that Stutchman's analysis was scientifically meaningless, the prosecution's expert relied in part on the fact that the circumstances under which his exemplar was made were different from those under which the original recording was made. [FN5]

> FN5.  Defendant also takes issue with the prosecution's challenge to the qualifications of Stutchman.  There is no point to this challenge, however, since the trial court admitted Stutchman's expert testimony.

Op. at 7-8.

7

The state appellate court concluded that the trial court properly denied the motion for a new trial and ultimately rejected Petitioner's claim.

> The record supports the trial court's conclusion that Owen's opinion was not newly discovered evidence that with reasonable diligence could not have been produced at the initial trial. Defendant knew that the recording would be offered by the prosecution and the threatening statements attributed to him. He was prepared to call Stutchman and Bowie to refute the prosecution's evidence that he had made the statements. At the hearing on the new trial motion, the court indicated that it "would have been receptive" to moving defendant to a different facility to obtain an exemplar at the first trial had such a request been made. Although defendant states that he "sought to have Mr. Stutchman obtain such exemplars but apparently neither Quenell nor the prosecution would agree to that," he offers no record citation for this assertion. We find in the record no request that he be permitted to provide an expert an adequate exemplar of his voice nor any objection that the prosecution had precluded his expert from obtaining an appropriate exemplar when the prosecutor challenged the admissibility of Stutchman's testimony. [FN6] Thus, we find no basis to disagree with the trial court that with reasonable diligence defendant could have prepared an expert, either Stutchman or Owen, to formulate an opinion based on an exemplar obtained in a physical setting comparable to the outdoor setting in which the relevant events transpired.
>
> > FN6. At a hearing after the trial had begun, defense counsel asked, "for the purposes of an aural spectrographic analysis, the jail cell cinder block interview room would not be adequate. Perhaps Mr. Stutchman could do an exemplar of Mr. Dinsmore outdoors at the scene where we could get an exemplar which would allow an aural spectrographic analysis to nail this thing shut." The prosecutor stated, "I'd like to give it some thought and give an answer tomorrow." The court agreed to this request. The following day the court took up the issue of the admissibility of the mean frequency analysis and the fact that Stutchman could not perform an aural spectrographic analysis using an exemplar that was taken in conditions differing from those in which the original recording was made, but the issue of transporting defendant to a different location to make an appropriate exemplar was not raised.
>
> "The requirement of diligence serves 'a public policy which demands that a litigant exhaust every reasonable effort to produce at his trial all existing evidence in his own behalf, to the end that the litigation may be concluded.' [Citations.] That policy, however, itself serves a more fundamental purpose - the determination of guilt and innocence. Loyal to that higher purpose, some California cases suggest that the standard of diligence may be relaxed when the newly discovered evidence would probably lead to a different result on retrial." (*People v. Martinez* (1984) 36 Cal.3d 816, 825.) Here, the trial court based its denial of the new trial motion not only on the lack of reasonable diligence, but on the additional ground that the proposed testimony of Owen was not likely to affect the outcome of trial. This

8

determination, if supported by the record, provides a sufficient basis for denying the motion, independent of the issue of diligence.

The record fully supports the trial court's finding that Owen's testimony would not likely change the outcome in a retrial. The recorded statement was principally relevant to the attempted murder charge, and defendant was not convicted on that charge. The district attorney barely referenced the statement in his closing argument and then only with regard to the attempted murder charge. Since the attempted murder charge has been dismissed, the testimony of Owen could not possibly lead to a more favorable outcome on that count.

Defendant argues that the evidence was also relevant to the offense of assault on a peace officer with an automatic weapon for which he was found guilty. However, there was overwhelming compelling evidence, entirely independent of the voice recording, to prove that defendant forcibly resisted arrest and to support his conviction on that count. Four officers testified in explicit detail to defendant's resistance to arrest and efforts during the struggle to fire the gun at the officers. Even the driver of the car in which defendant had been riding acknowledged that defendant resisted arrest, though he denied defendant was "assaulting" the officers. Testimony by Owens that the voice on the recording was not defendant's would not "diminish the strength of much more damaging testimony against defendant." (*People v. Delgado, supra*, 5 Cal.4th at p. 329.)

Finally, regardless of the results of the voice analysis, the substance of the recorded statements is such that the jury was not likely to find that one of the police officers, rather than defendant, made the statements. According to all of the witnesses, including Bowie, when the statements were made defendant was pinned to the ground by at least two officers. A command by one of the officers to "back up" could not sensibly have been directed to defendant, nor would an officer likely have used the third person pronouns "him" and "he" in stating who he would shoot "if you don't move." The statements are sensible only if made by defendant, threatening to shoot one of the officers if the others did not "back up" and "back down."

In closing argument, defendant relied on Bowie's testimony to suggest that the statement on the tape that the prosecution attributed to defendant – "I know what I gotta do. I'll shoot him if you don't move. Back up or he's dead. Back down now or I'll fuckin' kill you. Swear to God." – was made by one of the deputies. Defense counsel repeated statements Quenell testified to making, [FN7] then said, "Why is that important? Because it's not 'get off me.' It's not 'let me go.' It's back off or back up. Back down now. Oh, God. Swear to God. Swear to God. Oh God, I'm going to shoot this fucker.' That's what [Bowie] remembers over a year later.... He didn't change his story when it would have been very easy to do, when it was being suggested to him that maybe that's what he heard." This argument implied that Bowie identified a deputy as the speaker of the statement in question when in fact Bowie did not so testify. Bowie testified consistently with the officers and the recording that he heard one of the officers yell, "Get back. Get back. I'm gonna shoot this fucker in the head." He did *not* testify that he heard anyone make the

9

> controverted statement on the tape, which the prosecution attributed to defendant. Moreover, it is clear that Bowie did not accurately perceive the entire incident since he also testified that he never saw defendant with a gun, but it is undisputed that defendant was armed with two guns. In short, placed in the context of the complete record, it is not probable that a new trial in which Owen gave his proffered testimony would result in a different outcome. The trial court did not abuse its discretion in denying the motion for a new trial. (*People v. Williams*, *supra*, 45 Cal.3d at p. 1318).
>
> > FN7. On cross-examination Quenell acknowledged that he threatened to shoot defendant if defendant did not drop his weapon. Quenell read from a transcript of the recording statements that he had made during the altercation: "I'm going to shoot him in the back of the head, Mike," "Mike, I'm gonna pop him," "Steve, I will shoot you in the back of the head," and "Let go of the gun or I'm going to shoot you, Steve."

Op. at 8-10.

Respondent first argues that this claim is an allegation of state law error which cannot be grounds for federal habeas relief. Ans. at 11. Furthermore, Respondent asserts that although Petitioner's claim is couched in terms of the due process clause, the claim is really challenging a "discretionary state post-conviction motion," *i.e.*, a motion for new trial, which is simply not cognizable. *Id.*, citing *Ortiz v. Stewart*, 149 F.3d 923, 939 (9th Cir. 1998). Lastly, Respondent also asserts that the claim itself is meritless.

Even assuming that the claim is cognizable in federal habeas, the claim is without merit. In denying the motion, the trial court reasoned that the proffered "new evidence" of Owen's testimony would not have changed the outcome in a retrial. The audio recording of the struggle between Petitioner and the officers included a voice saying: "I know what I gotta do. I'll shoot him if you don't move. Back up or he's dead. Back down now or I'll fuckin' kill you. Swear to God." Whether Petitioner's voice matched the recording was principally relevant to the attempted murder charge which was ultimately dismissed. The statement was hardly relevant with respect to the charges on which Petitioner was actually convicted, *i.e.*, assault on a peace officer with an automatic firearm use enhancement, resisting an executive officer, two counts of being a felon in possession of a firearm, and possession of methamphetamine. The state appellate court reasonably upheld the trial court's decision that the proffered new evidence "could not possibly [have] lead to a more favorable outcome on [the attempted murder charge]." Op. at 10. The state courts' rejection of this claim was

not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent. 28 U.S.C. § 2254(d).

B.  <u>Ineffective Assistance of Counsel</u>

The Sixth Amendment to the United States Constitution guarantees a defendant the right to effective assistance of counsel in a criminal prosecution. *McMann v. Richardson*, 397 U.S. 759, 771, n.14 (1970). In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Second, he must establish that he was prejudiced by counsel's deficient performance, *i.e.*, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* Judicial scrutiny of counsel's performance must be highly deferential: "[a] court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (quoting *Strickland*, 466 U.S. at 689).

If a Petitioner cannot establish that defense counsel's performance was deficient, it is unnecessary for a federal court considering a habeas ineffective assistance claim to address the prejudice prong of the *Strickland* test. *See Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998). Conversely, if a Petitioner cannot show prejudice, the court may presume deficient performance and resolve the claim on the prejudice prong. *See id* at 697 (court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as the result of the alleged deficiencies); *Williams v. Calderon,* 52 F.3d 1465, 1470 & n.3 (9th Cir. 1995) (applauding district court's refusal to consider whether counsel's conduct was deficient after determining that Petitioner could not establish prejudice).

When considering an ineffective assistance claim in a habeas case, federal courts must apply a "doubly" deferential standard. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1410-11 (2011); *Harrington*, 131 S. Ct. at 788; *Premo v. Moore*, 131 S. Ct. 733, 740 (2011). When § 2254(d)

applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 131 S. Ct. at 788.

### 1. Failure to Obtain a Second Voice Analysis Until After Trial

The Court of Appeal rejected Petitioner's first claim of ineffective assistance of counsel for failure to obtain a second voice analysis until after trial.

> Defendant also argues that by failing to obtain a satisfactory exemplar and Owen's testimony, he was denied effective assistance of counsel. "A defendant claiming ineffective representation bears the burden of proving by a preponderance of the evidence both (1) that counsel's performance was deficient, i.e., that the representation fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been more favorable to defendant, i.e., a probability sufficient to undermine confidence in the outcome." (*In re Ross* (1995) 10 Cal.4th 184, 201.) For the same reason that we conclude the trial court did not err in denying the new trial motion, defendant did not receive ineffective representation; that is, there is no reasonable probability that a different verdict would have been reached had trial counsel succeeded in obtaining and presenting Owen's testimony.

Op. at 7.

This first ineffective assistance of counsel claim fails because Petitioner cannot establish the second prong under *Strickland*. Even if we assume that counsel rendered deficient performance, Petitioner fails to show that he was prejudiced, *i.e.*, but for counsel's error, there is a reasonable probability that the result of the proceeding would have been different. As discussed above, the issue of the identity of the voice in the recording was principally relevant to the attempted murder charge which was ultimately dismissed. Furthermore, even if the evidence was relevant to the offence of assault on a peace officer with an automatic weapon, the state appellate court reasonably found that "there was overwhelming compelling evidence, entirely independent of the voice recording, to prove that [Petitioner] forcibly resisted arrest and to support his conviction on that count." Op. at 10; *see supra* at 8-9. Accordingly, this claim is without merit.

### 2. Failure to Object to the Reading of the Prior Conviction Allegations to the Jury

Petitioner claims that trial counsel rendered ineffective assistance when he allowed the trial court to read to the jury the prior conviction allegations even though Petitioner had already

stipulated to the fact of the prior convictions, and because counsel did not request an instruction limiting the jury's use of the evidence.

The Court of Appeal summarized what occurred at trial with respect to this claim:

> The information alleged in two counts that defendant possessed firearms ("a .50 caliber Desert Eagle handgun" and "a .40 caliber Glock model 27 semi-automatic pistol") after having been convicted of a felony, thus violating section 12021, subdivision (a)(1). The information specified that defendant had been convicted of "the crimes of grand theft of a firearm and burglary." The information further alleged that defendant had previously been "convicted of a serious or violent felony, to wit, grand theft of a firearm and burglary" within the meaning of section 1170.12, subdivisions (b) and (c) (the three strikes law).
>
> Before trial commenced, defendant waived his right to a jury trial on the fact of the prior convictions and stipulated that he had been convicted of the two alleged felonies. The trial court then asked, "Also, there is a special allegation at the very end of the information which alleges that those convictions constitute serious or violent felony convictions. Would either counsel have any objection to the court reading that special allegation in the information at the outset of the trial?" Both attorneys indicated they did not object.
>
> In reading the charges to the jury, the trial court told the jury that defendant had been "duly and legally convicted of a felony, to wit, the crimes of grand theft of a firearm and burglary." This allegation was read twice, once for each count of felon in possession of a firearm. The trial court then told the jury that "It is further alleged as to count one through count six that the... defendant... was on or about November 3rd, 1995,... convicted of a serious or violent felony, to wit, grand theft of a firearm and burglary." The trial court also informed the jury that the parties had stipulated that defendant had been convicted of "grand theft of a firearm and second degree burglary."

Op. at 12-13.

The Court of Appeal rejected this claim, finding counsel's decision to agree with the reading was part of his defense strategy and that any error was not prejudicial.

> The Attorney General argues that defense counsel had a strategic reason for allowing the prior conviction to be read; specifically, that defendant "made use of his reputation, including his prior convictions, to assert the officers overreacted." "Our review of counsel's performance is a deferential one. [Citation.] "It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the

13

circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action, "might be considered sound trial strategy."'" (*In re Jones*, *supra*, 13 Cal.4th at p. 561.)

In closing, defense counsel argued that the police officers "freaked out. I believe that they were panicking. I believe that maybe they thought they were fighting for their lives. And they whaled on Steve.... and at the end of it, you had a bloody pulp. And it's like, how do we explain that? How do we do this? Well, he's got these two scary guns. He's got these two scary knives. He's got these huge bullets. He was trying to kill us, obviously. And who's gonna care? Who's gonna believe this guy who's got these guns, got these knives, got these bullets, has this record? He's a felon. In 1995, a second degree burglary. Grand theft of a firearm. Who's gonna believe this guy?"

In other words, defense counsel used the prior felony convictions both to explain the force that the officers brought to bear in attempting to arrest defendant and to impugn the credibility of the officers' testimony, which counsel suggested at length earlier in his closing argument had changed between the time of the incident and the time of trial. This argument may well have been effective, since the jury was unable to reach a verdict on the charge of attempted murder, finding defendant guilty only of assault on a police officer.

Defendant also argues that his trial counsel was ineffective for failing to request an instruction limiting the jury's use of the prior felony convictions. He cites *Valentine*, in which the court stated that "where the fact of a prior conviction is admitted solely to establish ex-felon status as an element of violation of section 12021, the trial court, at defendant's request, should give an instruction limiting the jury's consideration of the prior to that single purpose. The instruction should make clear that the nature of the prior conviction is irrelevant in this context, and that the jury should not speculate on the nature of the prior." (*People v. Valentine*, *supra*, 42 Cal.3d at p. 182, fn. 7.) A limiting instruction in this case would have been antithetical to trial counsel's apparent tactical decision to allow the jury to be informed of the nature of defendant's prior convictions to support his argument that the officers used excessive force in arresting defendant and to suggest that the officers thought they could lie with impunity about the events of that night because defendant's prior convictions deprived him of credibility.

Moreover, it is not reasonably probable that excluding references to defendant's prior felony convictions would have resulted in a more favorable outcome. The jury's finding that defendant assaulted the police officers was supported by the testimony of all of the eye witnesses. Although Dorey did not characterize the altercations as an assault, he conceded that defendant was armed and that he was struggling with the officers. Bowie also testified to a struggle and,

14

> while he testified that he did not see defendant armed with a gun, defendant does not contest this element. All four officers testified consistently that defendant was trying to discharge one of the guns during the struggle. The evidence that defendant assaulted the officers with a gun was overwhelming. He was not denied effective assistance of counsel.

Op. at 14-16.

It is clear from defense counsel's closing statements that he intended to use Petitioner's prior convictions to argue that the officers overreacted and to attack their credibility. Therefore it was part of the defense strategy to not object to the reading of the priors to the jury. As the state appellate court observed, it appears that counsel's strategy was indeed effective as the jury was unable to reach a verdict on the attempted murder charge. Furthermore, requesting a limiting jury instruction with respect to the use of the prior convictions would have undermined counsel's strategy to attack the actions and credibility of the officers based on their knowledge of Petitioner's criminal history. Accordingly, the Court finds that Petitioner has failed to overcome the "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington*, 131 S.Ct. at 788. Moreover, the Court of Appeal's conclusion that the alleged failure by counsel was not prejudicial was not an unreasonable determination under § 2254(d).

       3.    <u>Failure to Object and Preserve Sentencing Error Claims for Appeal</u>

Petitioner's last claim is that the trial court erred during sentencing and that his counsel rendered ineffective assistance by failing to object to all the errors and preserving the issues for appeal.

The Court of Appeal summarized what occurred at sentencing.

> The court sentenced defendant to the aggravated term of nine years for assaulting a peace officer, doubled to 18 years because of defendant's prior convictions (§ 1170.12, subd. (c)(1)), plus an additional 10 consecutive years for the use of a firearm (§ 12022.53, subd. (b)). The court imposed one-third the midterm, or one year and four months, for resisting arrest, but imposition of this sentence was stayed because Braud was named as the victim under both this count and under the count for assaulting a peace officer. For the first count of being a felon in possession of a firearm the court imposed a consecutive one-third the midterm, or eight months, which was doubled because of the prior conviction. The court imposed the same sentence for possession

> of methamphetamine, also consecutively. The court imposed but stayed imposition of another one-year four-month term for the second count of felon in possession of a firearm.
>
> In imposing the upper term for assaulting a peace officer, the trial court stated that it found "that aggravating factors outweigh mitigating factors. Specifically, in mitigation I do find Mr. Dinsmore had satisfactory performance on parole. That's rule 4.423(b)(6) [of the California Rules of Court]. That is a factor in mitigation. However, in aggravation, we have several factors. We have rule 4.421(a)(1), this crime... did involve great violence and threat of great bodily injury which demonstrates a high degree of callousness. We have rule (b)(1), Mr. Dinsmore has engaged in violent conduct which indicates a serious danger to society. And finally, we have rule 4.421(b)(3), Mr. Dinsmore has served a prior prison term; therefore, the court finds the aggravated term to be the appropriate one as to count number two."

Op. at 16-17.

Petitioner claims that the trial court erred when it used a single fact – that he used "great violence and threat of great bodily injury" – to both aggravate the base term and to impose an enhancement. Petitioner also argued for the first time before the Court of Appeal that the trial court erred in characterizing his prior treatment-oriented commitment to the California Rehabilitation Center ("CRC") as an aggravating "prison term" factor in imposing the upper term. Although the Court of Appeal considered this last contention waived for failing to raise it at trial, it proceeded to consider and deny the claim on the merits.

> Nonetheless, the record supports the trial court's implicit finding that the level of violence involved in defendant's assault significantly exceeded the degree of violence that is inherent in the commission of the offense or the use of a firearm, and its explicit finding that the conduct disclosed a high degree of viciousness and callousness. (Cal. Rules of Court, rule 4.421(a)(1).) Defendant did not simply commit a battery or brandish a weapon. In an extended struggle, four officers were required to subdue defendant, who the evidence indicates made continuing efforts to discharge one of the two firearms that he had been carrying. Defendant's behavior involved a degree of violence, threat of harm and viciousness well beyond that which is necessarily encompassed in the crime for which he was convicted. "[W]here the facts surrounding the charged offense exceed the minimum necessary to establish the elements of the crime, the trial court can use such evidence to aggravate the sentence. [Citation.] Stated another way, rule [4.]420(d) does not preclude a court from using facts to aggravate a sentence when those facts establish elements not required for the underlying crime." (*People v. Castorena* (1996) 51 Cal.App.4th 558, 562, italics omitted; see also *People v. Hawk* (1979) 91 Cal.App.3d 938, 941 [court properly imposed upper term for rape conviction

16

> relying on viciousness and callousness, and an enhancement for great bodily injury].)
>
> In all events, the trial court also relied upon defendant's criminal history in choosing the upper term. Defendant argues that the court erred in relying on a "prior prison term" because his prior commitment to the [CRC] was not a "prison term" within the meaning of rule 4.421(b)(3) of the California Rules of Court. This contention was waived since it was not raised in the trial court. "In order to encourage prompt detection and correction of error, and to reduce the number of unnecessary appellate claims, reviewing courts have required parties to raise certain issues at the time of sentencing. In such cases, lack of timely and meaningful objection forfeits or waives the claim." (*People v. Scott*, *supra*, 9 Cal.4th at p. 351.)
>
> Waiver aside, rule 4.421(b)(2) of the California Rules of Court allows the court to consider that "defendant's prior convictions... are numerous or of increasing seriousness." Defendant's crimes in this case were substantially more serious than his prior convictions for second degree burglary and theft, which also supports imposition of the aggravated term. Moreover, the cases cited by defendant hold that a commitment to the CRC "is not 'confinement imposed "*as punishment* for commission of an offense[]"'" for the purpose of imposing an additional term under section 667.5. (*People v. Shoals* (1992) 8 Cal.App.4th 475, 501; *People v. Lara* (1979) 95 Cal.App.3d 247, 249-250.) Those cases do not speak to use of recidivism as a factor in imposing the upper term. The trial court did not err in relying on the offenses for which defendant was committed to CRC.

Op. at 17-19.

The state appellate court was not unreasonable in finding that the trial court properly sentenced Petitioner in accordance with state regulations. State sentencing courts must be accorded wide latitude in their decisions as to punishment. *See Walker v. Endell*, 850 F.2d 470, 476 (9th Cir. 1987), *cert. denied*, 488 U.S. 926, *and cert. denied*, 488 U.S. 981 (1988). Generally, therefore, a federal court may not review a state sentence that is within statutory limits. *See id.* While there are exceptions under the Due Process Clause and the Eighth Amendment, Petitioner's allegations implicate no such exceptions.[2] The state appellate court found that "[Petitioner]'s behavior involved a degree of violence, threat of harm and viciousness well beyond that which [was] necessarily

---

[2] For example, a federal court may vacate a state sentence imposed in violation of due process if a state trial judge (1) imposed a sentence in excess of state law, *see Walker*, 850 F.2d at 476; or (2) enhanced a sentence based on materially false or unreliable information or based on a conviction infected by constitutional error, *see United States v. Hanna*, 49 F.3d 572, 577 (9th Cir. 1995); *Walker*, 850 F.2d at 477; *accord Brothers v. Dowdle*, 817 F.2d 1388, 1390 (9th Cir. 1987) (factual basis required for factors when factors used to aggravate sentence).

encompassed in the crime for which he was convicted" and that Petitioner's crimes were of "increasing seriousness" such that an imposition of the aggravated term was warranted.

The state appellate court also rejected Petitioner's claim that the trial court erred in failing to state its reasons for imposing consecutive terms for possession of a firearm and possession of methamphetamine for lack of prejudice.

> While we agree that the trial court should have stated its reasons for imposing consecutive sentences for these two counts, it is not reasonably probable that a different result would have [been] obtained had defendant objected. The trial court has broad discretion to impose consecutive sentences and may rely on "[a]ny circumstances in aggravation" except those facts used to impose the upper term, to enhance defendant's sentence, or that are elements of the crime. (Cal. Rules of Court, rule 4.425(b).) As noted above, the court identified three valid reasons for imposing the upper term (great violence, threat of great bodily injury, and recidivism) when only one was required. (*People v. Osband* (1996) 13 Cal.14th 622, 730 ["a single factor in aggravation suffices to support an upper term"].) The court could have used either of the remaining factors in choosing to impose consecutive sentences for the remaining counts, and the tenor of the court's remarks provide no basis to suspect that the court would not have done so.

Op. at 19.

Again, Petitioner fails to show that the alleged error by the trial court warrants habeas relief. As the state appellate court points out, the record shows that the trial court had articulated several factors in imposing the upper term, and he could have relied on either of the remaining factors in imposing consecutive sentences for the remaining counts. In other words, there were factors in aggravation identified by the trial court in its earlier remarks by which it could have articulated its reasons for imposing consecutive sentences for the remaining counts. Accordingly, this claim is without merit.

Although state law may guarantee a defendant certain procedural rights at sentencing which may not be arbitrarily denied under due process, *see Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980); *Fetterly v. Paskett*, 997 F.2d 1295, 1300 (9th Cir. 1993), *cert. denied*, 513 U.S. 914 (1994), federal court may not review a claim that a state court failed to state its reasoning for a particular sentence pursuant to state law when the sentence imposed was clearly within its discretion. *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994) (failure to abide by state requirement that trial court

state reasons for sentencing consecutively does not rise to level of federal habeas due process claim), *cert. denied*, 514 U.S. 1026 (1995); *Branch v. Cupp*, 736 F.2d 533, 536 (9th Cir. 1984) (same), *cert. denied*, 470 U.S. 1056 (1985).  Such a claim fails to rise to the level of a constitutionally protected liberty interest.

For the reasons discussed above, Petitioner's claim that his counsel rendered ineffective assistance for failing to object to all the trial errors at sentencing is also without merit.  Even assuming that counsel rendered deficient performance, Petitioner fails to show that he was prejudiced, *i.e.*, but for counsel's error, there is a reasonable probability that the result of the proceeding would have been different.  The state appellate court considered Petitioner's sentencing error claims on the merits and found that the trial court committed no error.  Therefore, it cannot be said that Petitioner was prejudiced by counsel's failure to object to the alleged trial errors such that he was unable to raise these claims on appeal.  Accordingly, this claim is without merit.

C.      Appealability

The federal rules governing habeas cases brought by state prisoners have recently been amended to require a district court that denies a habeas petition to grant or deny a certificate of appealability in the ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009).

A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a certificate of appealability (formerly known as a certificate of probable cause to appeal).  *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).  A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The certificate must indicate which issues satisfy this standard.  *See id.* § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

This was not a close case.  For the reasons set out above, jurists of reason would not find the result debatable or wrong.  A certificate of appealability will be denied.  Dinsmore is advised that he

may not appeal the denial of a COA, but he may ask the court of appeals to issue a COA under Rule 22 of the Federal Rules of Appellate Procedure. *See* Rule 11(a), Rules Governing § 2254 Cases.

## VI. CONCLUSION

The petition for a writ of habeas corpus is **DENIED**. A certificate of appealability is **DENIED**. The Clerk shall close the file.

IT IS SO ORDERED.

Dated: July 9, 2012

_____
EDWARD M. CHEN
United States District Judge